## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-CA-00035-SCT

*VIRDO CAMPBELL*

*v.*

*JACKIE WHITTINGTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/95 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LOUISE HARRELL |
| ATTORNEY FOR APPELLEE: | EARL WAYNE SMITH |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 3/11/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Virdo Campbell appeals a decision by a special tribunal declaring Jackie Whittington the winner in the race for District 3 Supervisor of Amite County, *after* Campbell had previously been declared the winner by the Amite County Democratic Party Executive Committee. We affirm the tribunal's determination as to the 20 rejected absentee ballots, concluding that the irregularities cited by the tribunal impugn the integrity of the ballots.

### I.

¶2. On August 29, 1995, in Amite County, Mississippi, Virdo Campbell (Campbell) and Jackie Whittington (Whittington) competed for the seat of District 3 Supervisor in a Democratic Party second primary election. At the conclusion of the election, Whittington personally challenged 21 absentee ballots and six affidavit ballots, all of which were cast at the Gloster poll. In particular, Whittington challenged all absentee ballots that were witnessed by Davis Anderson. He challenged the affidavit ballots because the voters listed post office boxes as their addresses. Pursuant to statute, the voting poll station manager set the challenged ballots aside to be dealt with by the Amite County Democratic Executive Committee (the Committee).

¶3. At the hearing regarding the challenged ballots, there was testimony that the Committee decided to

count the 21 absentee ballots and that the Committee intended to certify Campbell the winner. However, the next morning, the papers declared Whittington the winner. One of the exhibits at the trial, a tally sheet, showed the totals to be 625 votes for Campbell and 649 votes for Whittington. These figures appear next to crossed-out totals that appear to have been 646 votes for Campbell and 649 for Whittington. However, Campbell claims the crossed-out figures truly read 652 votes for him and 649 votes for Whittington.

¶4. One member of the Committee testified that the Committee met on August 30 and 31, examined the challenged ballots, and decided to count them. This member claimed that they then sent a certification to the Circuit Clerk's office indicating that Campbell had won with 652 votes as compared to Whittington's 649 votes. However this claim contradicts the testimony of another Committee member who stated that Whittington was certified the winner, a claim that is corroborated by this Court's assessment of the Committee's official tally. The exhibit which contains the formal totals appears to indicate that the figures were altered at some point. In any event, the later-added figures which replaced the crossed-out numbers were 625 for Campbell and 649 for Whittington, which would reflect the subtraction of the challenged 21 absentee ballots.

¶5. Regardless, Whittington won under either set of figures, unless Campbell's claim is true that the crossed-out figure for him was 652 votes. Campbell insists there is some document which shows the count to be 652 votes for him; however, we have not seen such a document. Campbell claims the Amite County Circuit Clerk crossed out the original totals without authorization from the Committee, after she was advised by the Attorney General's Office that challenged votes should not be counted. The Chairman of the Committee testified that they certified Campbell to have 652 votes; the clerk, however, testified that the document was finally certified after the alterations were typed in, which gave Campbell 625 votes.

¶6. The 646 crossed-out figure for Campbell is consistent with testimony that the Committee initially decided to count the absentee ballots and not the affidavit ballots. Nevertheless, during the course of the Committee's analysis of whether the challenged votes should be counted, the chairman of the Committee and the circuit clerk of the county contacted the Attorney General's Office for guidance.

¶7. An assistant attorney general orally advised the clerk that challenged votes should not be counted, but should be tallied in a separate return. The assistant attorney general reiterated this in a letter dated the following day, addressed to the chairman of the Committee. The assistant attorney general then crossed out the return figures that the Committee had given her and subtracted the 21 challenged absentee ballots from the figure for Campbell (all of the 21 absentee votes were for Campbell), thereby making Whittington the winner.

¶8. Following the certification and announcement of Whittington as the winner, Campbell challenged the decision via a sworn Petition Contesting the Election, filed with the Committee. On September 28, 1995, the Committee convened to address Campbell's petition, in which he argued that the 27 votes (21 absentee and six affidavit ballots) should have been counted. At the conclusion of that meeting, the Committee decided to count all 27 challenged votes. This decision effectively made Campbell the winner. Apparently nothing was communicated to the Secretary of State about the change in the winner because Whittington appeared on the general election ballot, unopposed, on November 7.

¶9. Before the general election, Whittington, now aggrieved by the Committee's reversal of its earlier certification and decision not to count the votes, filed a Petition for Judicial Review in the circuit court, seeking review of the Committee's actions. Pursuant to Miss. Code Ann. § 23-15-929 (Rev. 1990), this

Court appointed Chancellor Denise Owens to sit as circuit judge in the matter.

¶10. In accord with § 23-15-935, the circuit court, along with four Amite County election commissioners (the special tribunal), held a hearing on the matter. At the hearing, several Committee members testified, along with an assistant attorney general and several voters whose ballots were challenged. Following the hearing, the circuit court ruled that all of the absentee ballots were too irregular to be counted. Davis Anderson witnessed all 21 absentee ballots. He was accused by two of the voters, via deposition testimony or at the hearing, of overreaching. At the hearing, Anderson admitted signing several applicants' signatures to their ballots. Only one ballot application contained the date of the voters' signatures, although several were dated at the witness's signature and all were dated on the "Filed" stamp. One voter repudiated her ballot at the hearing and testified that she intended to vote for Whittington, not Campbell. Another voter failed to sign the envelope across the flap.

¶11. Considering the combined effect of the cited errors, the court found there was a persistent failure to comply with the election code and noted how suspicious it looked that all of the absentee ballots were witnessed by the same person, Anderson. As such, the court concluded that it had grave doubts about the integrity of the absentee ballots and consequently held them invalid. The court further found that the irregularities were not merely technical violations, but suggested flaws in the "very soul of the absentee ballot application."

¶12. Having thrown out 20 of the 21 absentee ballots (the trial court deemed one of the absentee ballots to be valid), the court declined to consider the validity of the affidavit ballots, ruling that such consideration was pointless as they could not change the outcome of the election. Two commissioners completely concurred with the court's holding; one partially concurred; and the fourth commissioner became ill and did not participate in the result. Based upon her ruling, the trial court formally declared Whittington the winner of the District 3 supervisor race, having found that Whittington was first certified as the winner of the race and that Whittington received 649 votes as opposed to Campbell's 626 (the original total of 625 + 1 absentee ballot deemed valid by the trial court) votes.

## II.

¶13. Campbell presently appeals the lower court ruling, raising four issues, including: whether the interference by the circuit clerk in the Committee's canvass procedure seriously undermined the fundamental fairness of the electoral process; whether the court erred in admitting into evidence the absentee ballots, the absentee ballot envelopes, and the absentee ballot applications due to a break in the chain of custody; that candidate Whittington did not prove fraud with respect to the absentee ballots; and, whether the lower court's ruling effectively disenfranchised elderly voters with disabilities and deprived them of their choice for county supervisor.

## III.

¶14. The Court notes Whittington's threshold challenge to the timeliness of this appeal. Specifically, Whittington argues appeals in these cases must be brought within three days of the judgment of the special tribunal. We find that this challenge is without merit. Under the old statute, one contesting a circuit court's disposition was required to file within three days after the judgment. However, under the amended statute which governs the instant dispute, appeals may be filed within the same time as provided by the court rules for all other kinds of judgments. Miss. Code Ann. § 23-15-933 (Supp. 1998) (contestant and/or contestee

may file an appeal within the time established by the Supreme Court for other appeals).

¶15. Rule 4(a) of the Mississippi Rules of Appellate Procedure provides that appeals may be taken from judgments in circuit courts within 30 days from the date of entry of the judgment. The date of entry of the judgment here was December 12, 1995. Campbell timely filed his notice of appeal on January 11, 1996. Accordingly, we have jurisdiction over this appeal.

## IV.

¶16. Campbell argues that he was originally certified the winner of the bid for District 3 supervisor during the Committee's canvass. Thus, he opines that the circuit clerk was unauthorized to contact the Attorney General's Office and thereafter "meddle" in the Committee's decision with regard to counting the challenged votes. Campbell further argues that the Attorney General's "intervention" was unlawful and that the Secretary of State's Office "misread" the certification to indicate that Whittington was the winner. Campbell does not assert any prayer for relief at the close of these contentions, although he contends that these actions resulted in the denial of a right to vote for a class of voters.

¶17. Whittington, on the other hand, argues that the trial court made no mention of any misconduct on the part of the assistant attorney general. He further states that this contention is irrelevant to the issue at hand, which is the validity of the challenged ballots.

¶18. This Court is in agreement with Whittington that Campbell's contention is irrelevant. First of all, there is no evidence in the record that the assistant attorney general ordered one to do anything in this case. Thus, neither the assistant attorney general nor the circuit clerk can logically be said to have "converted [himself] into a canvassing board for the purpose of canvassing the vote, declaring the legality of votes cast and declaring the results," as Campbell contends. Furthermore, the issue in this case arises out of the Committee's actions with regard to the challenged votes. It really has nothing to do with whether the Committee acted in accord with the advice of the assistant attorney general or whether the circuit clerk was entitled to consult the Attorney General's Office. Besides, the record does not readily support Campbell's contention that he would have won without the "interference" of the Attorney General. Even the crossed-out figure on the return, as we read it, did not prove Campbell the victor.

¶19. Therefore, we conclude that this "argument" has no bearing on the lower court's disposition of the case; nor is it clear what Campbell wishes this Court to do about it, besides address the underlying question of whether the challenged votes should have been counted. This issue is without merit.

## V.

¶20. Campbell also argues that the trial court should not have admitted the absentee ballots into evidence because they were erroneously given to Whittington's counsel by the circuit clerk. Whittington's counsel presented a subpoena duces tecum to the circuit clerk for the original absentee ballot applications and envelopes. Whittington failed to serve the subpoena on Campbell's counsel, who asserts that she would have objected to the request. At the hearing, Campbell did, in fact, move to exclude the ballots because the chain of custody had been broken, arguing it would be impossible to authenticate the ballots.

¶21. The trial court, although distressed that the original ballots had been improperly released to Whittington without Campbell's knowledge, decided nevertheless to admit the ballots and consider Campbell's objection in assessing their weight. Campbell asserts that this ruling was erroneous. Whittington

counters that there has been no showing that the ballots were altered or tampered. Indeed, the circuit clerk had previously made photocopies of the ballots prior to releasing them. She also called the Attorney General's Office to find out if she had to release the ballots. The photocopies were compared to the originals at the trial and were shown to be no different. This assignment of error is without merit also.

¶22. While it is troubling that the ballots were released to Whittington under any circumstances, and even more troubling that they were released without notice to Campbell, the clerk *had* made copies of the originals prior to releasing them. Also, the originals and copies were compared at trial and were no different.

¶23. Furthermore, Campbell fails to demonstrate any harm to his case from the admission of the absentee ballots. Indeed, the instant challenge could not have been addressed without the ballots being admitted into evidence. This Court has held that a decision to admit evidence is within the sound discretion of a trial court and will not be reversed unless the discretion is "so abused as to be prejudicial to a party"....*Stewart v. Stewart*, 645 So. 2d 1319, 1320 (Miss., 1994) (quoting *Century 21 Deep South Properties, Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss., 1992)). The lower court did not abuse its discretion in admitting the absentee ballots into evidence.

## VI.

¶24. Campbell next contends that the trial court's ruling, excluding the 20 absentee ballots from the vote count, was in error as there was no evidence that any of the absentee voters engaged in fraudulent behavior in casting their ballots. Thus, Campbell asserts that the lower court's ruling effectively disenfranchised a class of voters. Campbell reiterates the various disabilities that caused the voters to need others to affix their signatures to the ballots. He argues that the trial court's ruling necessarily means that people with similar disabilities will no longer be able to make use of the absentee ballot process.

¶25. This Court is required to accept the findings of a special tribunal in regard to an election where the findings are agreed to unanimously by the election commissioners in attendance at the hearing. Miss. Code Ann. § 23-15-933 (Supp. 1998). In this case, however, only two of the three commissioners who participated in the result concurred fully in the judge's findings. The third commissioner dissented in part, and the part to which that commissioner dissented is not in the record. As such, this Court is free to "make such findings as the evidence requires." *Id.*

¶26. Based upon careful consideration of the record evidence, this Court concludes that the evidence adequately supports the trial court's findings regarding the irregularities of the ballots. The trial court found that all of the absentee ballots were voted by persons afflicted with various infirmities and that all of the applications and ballots were witnessed by the same person. The trial court conceded, however, that this fact (witnessing by the same person) alone did not vitiate the validity of the ballots. The court then noted other irregularities, such as the fact that several voters stated during deposition or hearing testimony that they had not affixed their own signatures to the applications or ballots because they were either illiterate or unable to write due to some disability. These voters directed Anderson to affix their signatures in light of their inability to do so.

¶27. The court further described, with evident displeasure, the fact that one of the voters testified at trial that she had never intended to vote the way her absentee ballot reflected. This testimony effectively repudiated that voter's signature and ballot. The court also described another voter, who had not signed the ballot

envelope, as having given every impression on the stand that she was completely unfamiliar with the absentee voting process.

¶28. Based upon this information, the trial court concluded that these irregularities undermined the court's confidence in the integrity of *all* the absentee ballots (except one) and therefore invalidated 20 of them. The court held these defects went to the "very soul" of the absentee balloting process.

¶29. Whittington relies upon the language in Miss. Code Ann. § 23-15-721(2) (Rev. 1990), which directs that "[e]lectors who are temporarily or permanently physically disabled *shall sign* the elector's certificate..." (emphasis added) to argue that the Legislature intended for all absentee voters to sign their own ballots, which supports the trial court's rejection of the absentee ballots. Whittington further cites this Court's decisions, holding that statutes governing absentee ballots are mandatory, to argue that § 23-15-721(2) must be followed in order to combat the abuse that can easily pervade absentee voting. *E.g., Lewis v. Griffith*, 664 So. 2d 177 (Miss., 1995) (invalidating absentee votes that were hand-delivered to circuit clerk's office by circuit clerk herself where voters were able-bodied members of the clerk's family who could have complied with the statutory requirement that such ballots be either executed in the clerk's office or returned to the office by mail).

¶30. On the other hand, this Court has also held that mere technical irregularities will not vitiate the validity of an election where there is no evidence of fraud or intentional wrong. *Wilbourn v. Hobson*, 608 So. 2d 1187, 1192 (Miss., 1992); *see also Chinn v. Cousins*, 201 Miss. 1, 8, 27 So. 2d 882, 883 (Miss., 1946) (holding lawful a "sane and practical relaxation indulged under circumstances where, despite trivial lapses, the voters have expressed their will by lawful ballot"); *Guice v. McGehee*, 155 Miss. 858, 124 So. 643 (Miss., 1929) (holding that in determining the effect of irregularities, all statutes are to be construed liberally in favor of the voter).

¶31. Although the general rule is that mere technical irregularities will not render a ballot invalid, the rule only applies in cases in which there is no evidence of fraud or intentional wrongdoing. *Wilbourn,* 608 So. 2d at 1192. In *Wilbourn,* there was no evidence of fraud or wrongdoing. In fact, both parties to that election contest stipulated that there was no evidence questioning the integrity of the contested affidavit ballots. *Id.* at 1188. Therefore, the Court reasoned that, "[i]f the integrity of a ballot is unquestioned, there is no good reason to disenfranchise a voter for some technical aberration beyond his control." *Id.* at 1193.

¶32. The case *sub judice* is distinguishable from *Wilbourn* for several reasons. *Wilbourn* involved a challenge to affidavit ballots which are cast at the polls on election day. Here the dispute involves absentee ballots cast away from the polls and prior to election day. Whittington contested the validity and integrity of the absentee ballots. The tribunal concluded that it seemed suspicious that Anderson had witnessed all of the contested ballots. Further, the tribunal found that several voters had not affixed their own signatures to the ballots because they were either illiterate or unable to write due to some disability. One voter testified that she had not intended to vote the way her absentee ballot was voted. Two voters' ballots were not signed at all. One of these voters indicated that she did not understand the absentee voting procedure. The other unsigned ballot is unexplained. The tribunal found that these irregularities were sufficient to call into question the integrity of 20 of the absentee ballots. We agree.

¶33. A person voting by absentee ballot must sign the affidavit on the ballot envelope. Miss. Code Ann. § 23-15-635 (Rev. 1990). No statute provides that the voter may authorize another person to sign the voter's name to the affidavit. *McFarland v. State*, 707 So. 2d 166, 178 (Miss., 1997) (affirming vote

fraud conviction where defendant signed another person's name on the absentee ballot envelope.) We have affirmed the invalidation of any absentee ballot where the signature on the ballot and envelop did not correspond. *Pegram v. Bailey*, 708 So. 2d 1307 (Miss., 1997).

¶34. Some of the absent voters in this case testified that they were unable to sign their own names due to some disability. Miss. Code Ann. § 23-15-721(2) (Rev. 1990) provides that "[e]lectors who are temporarily or permanently physically disabled shall sign the elector's certificate..." Campbell urges this Court to imply an exception for those absent voters who cannot sign their own names, likening it to a situation where a disabled voter receives assistance in voting at the polls. Miss. Code Ann. § 23-15-549 (Rev. 1990) allows blind or physically disabled voters who vote at the polls to declare to the managers of the election that they need assistance to vote due to blindness, disability, or inability to read or write. The voter is allowed to choose the person who will assist him in voting, except that he may not choose his employer, his employer's agent, or an officer or agent of the voter's union.

¶35. There are valid reasons why this type of exception should not be applied in the absentee voting setting. As opposed to voting at the polls, in a public setting where the integrity of the election process can be ensured, absentee voting takes place in a private setting where the opportunity for fraud is greater. To ensure the integrity of the election process through absentee voting, the legislature has seen fit to provide other safeguards. These provisions are mandatory. *Rogers v. Holder*, 636 So.2d 645, 649 (Miss., 1994). Under Miss. Code Ann. § 23-15-635 (Rev. 1990) the absent voter must vote his ballot in the presence of an attesting witness, place the ballot in the envelope, and sign the elector's certificate across the flap. The voter and the witness then swear that this process was followed. These safeguards are all that ensure the integrity of the absentee ballot process. *McFarland,* 707 So.,2d at 179. If these mandates are not followed and the integrity of the absentee ballots is questioned, the absentee ballots should not be counted.

## CONCLUSION

¶36. The mandates of the absentee voting statutes were not complied with in this case. Furthermore, one voter repudiated her vote at trial, while two ballots were found not to have been signed at all. All of the challenged absentee ballots were witnessed by the same person. Based on these facts, we agree with the tribunal that the integrity of 20 of the absentee ballots was questionable and cannot be ensured. Therefore, we affirm the judgment below.

¶37. **AFFIRMED.**

**PRATHER, C.J., SMITH AND MILLS, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J. WALLER, J., NOT PARTICIPATING.**

**BANKS, JUSTICE, DISSENTING:**

¶38. Because the majority opinion disqualifies 17 ballots without sufficient evidence that they were tainted, thereby disenfranchising, for this election, that number of voters, I dissent.

I.

¶39. This Court is required to accept the findings of a special tribunal in regard to an election where the findings are agreed to unanimously by the election commissioners that are in attendance at the hearing. Miss. Code Ann. § 23-15-933 (Supp. 1998). In this case, however, only two of the three commissioners who participated in the result concurred fully in the judge's findings. The third commissioner dissented in part and the part to which that commissioner dissented is not in the record. As such, this Court is free to "make such findings as the evidence requires." *Id.*

II.

¶40. The trial court found that all of the absentee ballots were voted by people afflicted with various infirmities and that all of the applications and ballots were witnessed by the same person. The trial court conceded, however, that this fact (witnessing by the same person) alone did not vitiate the validity of the ballots. The court then noted other irregularities, such as the fact that several voters stated during deposition or hearing testimony that they had not affixed their own signatures to the applications or ballots because they were either illiterate or unable to write due to some disability. These voters, however, directed Anderson to affix their signatures in light of their inability to do so.

¶41. The court further noted, with evident displeasure, the fact that one of the voters testified at trial that she had never intended to vote the way her absentee ballot reflected. This testimony effectively repudiated that voter's signature and ballot. The court also described another voter, who had not signed the ballot envelope, as having given every impression on the stand that she was completely unfamiliar with the absentee voting process.

¶42. Based upon this information, the trial court concluded that these irregularities undermined the court's confidence in the integrity of *all* the absentee ballots (except one) and therefore invalidated 20 of them. The court held these defects went to the "very soul" of the absentee balloting process.

¶43. In my view, the trial court's conclusion that 20 of the 21 absentee ballots needed to be invalidated was an overly punitive reaction, not well supported in law. An analysis of the various categories of irregularities supports this view.

¶44. First, there is no reason to invalidate the absentee ballot of a voter who cannot write simply because that voter has directed someone else to sign his or her name to the ballot or application. In this case, all but one of the voters who did not sign their names to the ballots explained that they expressly permitted someone else to do so as they were unable, generally due to physical infirmities, to sign their own names. There is nothing illegal about this practice, particularly given the undesirable but logically necessary alternative rule that people who, for whatever reason, cannot write their own names cannot vote an absentee ballot.

¶45. Whittington relies upon the language in Miss. Code Ann. § 23-15-721(2)(1990), which directs that "[e]lectors who are temporarily or permanently physically disabled *shall sign* the elector's certificate..." (emphasis added) to argue that the Legislature intended for all absentee voters to sign their own ballots, which supports the trial court's rejection of the absentee ballots. Whittington further cites this Court's decisions, holding that statutes governing absentee ballots are mandatory, to argue that § 23-15-721(2) must be followed in order to combat the abuse that can easily pervade absentee voting. *E.g., Lewis v.*

***Griffith***, 664 So. 2d 177 (Miss. 1995) (invalidating absentee votes that were hand-delivered to circuit clerk's office by circuit clerk herself where voters were able-bodied members of the clerk's family who could have complied with the statutory requirement that such ballots be either executed in the clerk's office or returned to the office by mail).

¶46. On the other hand however, this Court has also held that mere technical irregularities will not vitiate the validity of a ballot. ***Wilbourn v. Hobson***, 608 So. 2d 1187, 1192 (Miss. 1992); *see also **Chinn v. Cousins***, 201 Miss. 1, 8, 27 So. 2d 882, 883 (Miss. 1946) (holding lawful a "sane and practical relaxation indulged under circumstances where, despite trivial lapses, the voters have expressed their will by lawful ballot"); ***Guice v. McGehee***, 155 Miss. 858, 124 So. 643 (Miss. 1929) (holding that in determining the effect of irregularities, all statutes are to be construed liberally in favor of the voter).

¶47. I would construe the statute requiring disabled voters to sign their applications for absentee ballots to imply an exception for people who cannot sign their own names. Otherwise, by not so construing, people who are too disabled to sign their own names and who cannot make it to the polls would be effectively denied the opportunity to vote. *Cf.* Miss. Code Ann. § 23-15-549 (1990) (allowing blind or physically disabled voters who vote at the polls to receive any assistance required by a person of the voter's choice other than the voter's employer or an agent of the voter's union).

¶48. Previous cases in which this Court has held that the statutes governing absentee voting must be strictly satisfied are distinguishable on the ground that in each of those cases the voters *could have complied* with the statutory prescriptions, but simply opted not to. ***Cf. Lewis v. Griffith***, 664 So. 2d at 186 (invalidating absentee votes that were hand-delivered to circuit clerk's office by circuit clerk herself where voters were *able-bodied* members of the clerk's family who could have complied with the statutory requirement that such ballots be either executed in the clerk's office or returned to the office by mail); ***Rogers v. Holder***, 636 So. 2d 645, 648 (Miss. 1994) (invalidating absentee ballots by voters who had not completed an application for said ballots in any form); ***Shannon v. Henson***, 499 So. 2d 758 (Miss. 1986) (invalidating absentee ballots that contained no witness' signature on the envelope).

¶49. In the instant case, none of the voters who directed someone else to sign their ballots for them were physically able to sign their own names. Thus, the equitable interpretation of the statutory requirement that disabled voters "sign the elector's certificate" entails an exception for people who cannot, due to disability, sign their own names. It would be ideal for the legislature to speak to this gap in the absentee voting provisions. However since it has not done so, this Court should construe the statute to enable disabled people, who can neither sign their names nor travel to the polls to exercise their right to vote, to take advantage of the absentee ballot process. I would decline to invalidate the absentee ballots in this case on this basis alone.

¶50. Furthermore, I view the failure of the voters to date their ballot applications as mere technical irregularities that in no way affects the integrity of the voters' choices cast therein. All of the applications were dated on the circuit clerk's "Filed" stamp, and thereafter the circuit clerk mailed the actual ballots, which were then completed and returned. Contrary to the special court's observation, I do not find that the failure to date the applications goes to the "very soul" of the absentee ballot application process. Instead, I view this failure as a technical irregularity that does not diminish a court's ability to ascertain the will of the voter. Accordingly, I would decline to invalidate any ballots on this ground.

¶51. The trial court invalidated the bulk of the challenged absentee ballots on one or both of the previously

discussed grounds. Setting these grounds aside and reinstating the ballots that were wrongly invalidated under those grounds, leaves only 3 of the 20 rejected absentee ballots with serious irregularities that directly impeach their integrity.

¶52. One ballot was fully repudiated by the voter at the trial. Another two ballots from a married couple were not signed at all. The voter of one of those unsigned ballots later gave a notarized statement that she had not understood the absentee voting procedures at all. These three voters do suggest irregularities that directly impeach the integrity of the ballots, and therefore, this Court should uphold the trial court's invalidation of these ballots. The remaining 17 absentee ballots, however, should have been counted.

¶53. While the trial court seemed suspicious of Anderson's involvement (he witnessed all of the absentee applications and ballots), there is absolutely no evidence in the record impugning his integrity other than with regard to the one vote that was repudiated at trial. As noted earlier, all of the voters asked Anderson to sign their signatures for them, and the lack of a date on the ballot application seems to be of little substantive import. To punish the 17 otherwise untainted ballots, (and necessarily punish those voters) on account of three problematic votes is unwarranted.

¶54. Moreover, any "hint of unseemliness" that might arise from Anderson's involvement in the repudiated vote was cured by the favorable attestations of the other voters and the lack of any other meaningful defect. Indeed, no "hints of unseemliness" arises with regard to the other votes, beyond the almost universal lack of dates on the ballot applications. *Cf. Wilbourn v. Hobson*, 608 So. 2d 1187, 1193 (Miss. 1992) ("[I]f there had been even a hint of unseemliness associated with the ballots at issue, then even a technical irregularity might have rendered them void"); *Rogers v. Holder*, 636 So. 2d 645, 650 (Miss. 1994) (to void all absentee ballot votes from precincts in which a few of the votes had been proven fraudulent was an inappropriate response which would disenfranchise more voters than was warranted).

¶55. We should hold that the untainted 17 absentee votes should be counted, which would give Campbell 643 votes,[1] compared to Whittington's 649.

¶56. If we were to so hold, the validity of the 6 challenged affidavit ballots would become critical as they would give Campbell 6 additional votes (all of the affidavit ballots were cast for Campbell as well), resulting in a tie.

¶57. The testimony at the hearing about the affidavit ballots was inconclusive. There was some conflicting evidence as to whether the affidavit voters were actually residents of District 3 when they cast their ballots. The circuit clerk, who provided the only testimony concerning these ballots, testified that some of these voters were registered elsewhere but had moved into District 3 without notifying the registrar. The depositions from these voters that are a part of the record contain attestations of their addresses, but they do not provide any firm evidence that these addresses are within District 3.

¶58. Nonetheless, the trial court implied, in its order, that these votes were valid. Given that the record is unclear on the validity of these ballots, and given that the 6 affidavit ballots, if valid, would tie the number of votes for each candidate, it is my view that we should remand this case to the lower court for consideration of the validity of the 6 challenged affidavit ballots.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

1. Campbell originally had 625 votes not counting any absentee ballots. The trial court deemed 1 of the challenged absentee votes valid, thereby bringing Campbell's total to 626. If we hold that 17 of the absentee ballots should also have been counted, all of which were cast for Campbell, his total would be 643 votes.